U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 2 1 2016

CLERK, U.S. DISTRICT COURT
By _____
            Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SECURITIES AND EXCHANGE       §
COMMISSION,                   §
                              §
            Plaintiff,        §
                              §
VS.                           §   NO. 4:15-CV-438-A
                              §
GREGORY G. JONES,             §
                              §
            Defendant.        §

MEMORANDUM OPINION AND ORDER
RE DISGORGEMENT AND PENALTIES

A.   Background

By memorandum opinion and order issued February 17, 2016, in

the above-captioned action in which Securities and Exchange

Commission ("SEC") is plaintiff and Gregory G. Jones ("Jones") is

defendant, the court determined and declared that:

> (1)   The allegations in SEC's complaint are
> accepted by the court as accurate in determining the
> liability of Jones for disgorgement, prejudgment
> interest, and civil penalties, as requested by SEC in
> its complaint;

> (2)   Jones violated the securities laws of the
> United States (specifically Sections 5(a), 5(c), and
> 17(a) of the Securities Act [15 U.S.C. § 77e(a),
> 77e(c), and 77q(a), respectively] and Section 10(b) of
> the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5
> thereunder [17 C.F.R. § 240.10b-5]) in each of the
> respects alleged by SEC in its complaint; and

>      (3)  Jones is subject to disgorgement,
> prejudgment interest, and civil penalties by reason of
> such violations.

Doc. 113 at 21.[1]

The February 17, 2016 memorandum opinion informed that the court still had under consideration the portion of the motion for summary judgment pursuant to which the above-mentioned rulings were made requesting the court to define the amount, if any, to impose against Jones as disgorgement, prejudgment interest, and civil penalties, and the court indicated that a hearing might be ordered as to those matters.  Id. at 21-22.

On February 23, 2016, the court, after further review of the summary judgment record, concluded and found that $480,000 is a reasonable approximation of the profits Jones realized from his securities law violations in relation to Edwards Exploration, LLC ("Edwards"), and that (considering the limitations imposed by the allegations of the complaint) $645,000 is a reasonable approximation of the profits realized by Jones from his securities law violations in relation to the offering and sale of securities issued by Aquaphex Total Water Solutions, LLC ("Aquaphex").  Doc. 115 at 1-2.  Bearing in mind that the court found that Jones consented to the court's

---

[1]The "Doc. ___" references are to the numbers assigned to the referenced items on the docket in this Case No. 4:15-CV-438-A.

acceptance of the allegations of the complaint as true, Doc.
113 at 19-20, and the lack of summary judgment evidence
suggesting that full disgorgement should not be ordered, the
court found and concluded that Jones should be ordered to
disgorge the total amount of $1,125,000 in order to deprive him
of his ill-gotten gains in reference to the Edwards and
Aquaphex matters. Doc. 115 at 3. The court ordered a hearing
to be conducted for the court to consider (1) Jones's financial
condition as bearing on the timing of the payment of or
payments on his disgorgement obligation; (2) the interest
obligation, if any, to be imposed on Jones in reference to his
disgorgement obligation; and (3) civil penalties, if any, to be
imposed on Jones by reason of his securities laws violations as
alleged by SEC in its complaint. Id. at 5.

B.   The March 14-15 Hearing

The hearing, which commenced the morning of March 14, 2016,
and concluded on March 15, 2016, was conducted in two segments,
the first related to Jones's financial condition as bearing on
the timing of the payment of or payments on his disgorgement
obligation, and the second related to the civil penalties, if
any, to be imposed on Jones by reason of his securities laws
violations as alleged by SEC in its complaint. Doc. 127 at 10.
At the commencement of the hearing the court received in

3

evidence the exhibits shown on the parties' exhibit lists, except those withdrawn by Jones from his list. Id. at 6-7.

1.   The Disgorgement Segment and Disgorgement Rulings

Because Jones had the burden of establishing by a preponderance of the evidence inability to pay disgorgement, Doc. 115 at 4-5, the court invited Jones, through counsel, to proceed with his evidence on the first segment.  Jones was the only witness who testified on his behalf.  Doc. 127 at 11-167. Jones's only other evidence at the disgorgement segment were the eleven defendant's exhibits, id. at 7, that were offered and received at the beginning of the hearing.  Other than cross-examination of Jones and the exhibits of plaintiff that were offered and received at the beginning, SEC offered no evidence on the disgorgement issue.  Id. at 167.  At the ending of Jones's disgorgement testimony, each side informed the court that there was no more evidence to be offered on that issue. Id. at 67.

At the conclusion of the evidence on the disgorgement issue, the court stated on the record the court's finding that Jones has not persuaded the court that he did not have the

money to pay the $1,125,000 disgorgement amount in full.[2]  Id.
That finding led to the conclusion that Jones should be
required to pay to SEC at this time the full amount of his
disgorgement obligation.  The court found that an appropriate
amount to add to the disgorgement amount as interest is
$51,534, for a total of $1,176,534.  Id. at 73.  The court
ordered on the record at the conclusion of the disgorgement
segment of the hearing that Jones pay $1,176,534 to SEC by
delivering the payment to its counsel's office.  Id. at 73-74.

> 2.  The Court Did Not Find Jones's Testimony During the
>     Disgorgement Segment, or His Presentation During That
>     Segment, to be Credible

The court did not find the testimony given by Jones during
the disgorgement segment of the hearing, or his presentation
more generally during that segment, to be credible.  The court
was not impressed with Jones's demeanor for truthfulness while
he was on the stand, and the court questions whether he was
making a full disclosure of information pertaining to his
financial status.  His overall presentation left what appeared
to be gaps in important issues related to his financial history
and capability.

---

[2]The court noted that it took into account through failure of Jones to disclose documents
important to his financial capability.  Doc. 127 at 67-68.

An example was Jones's testimony relative to the home where he is now residing, which was described as a house he purchased approximately eight or nine years ago for $1,200,000, containing approximately 6,000 square feet. Doc. 127 at 37-38. Jones included in the exhibits he offered for consideration in the disgorgement segment of the hearing a notice of substitute trustee sale pertaining to a proposed non-judicial foreclosure of a mortgage lien against the home to be conducted on June 1, 2010, Def.'s Ex. 4; a notice dated March 7, 2010, from a mortgage servicing company advising Jones and his wife that the mortgage debt against the property, in the amount of $1,176,570.38 at the time of the notice, had been accelerated, and that, as indicated by an accompanying notice of substitute trustee sale, the lender proposed to sell the property to the highest bidder for cash, Def.'s Ex. 5; and a substitute trustee's deed showing that the home was sold at a non-judicial foreclosure sale conducted on January 5, 2016, to the holder of the mortgage debt, Def.'s Ex. 12. Thus, the exhibits suggested that Jones no longer had a financial interest in the home.

Upon questioning by his attorney during the disgorgement segment of the hearing, Jones sought to enhance that

suggestion, and he added a contention that he still owed the
lender a significant debt related to the house:

> Q. <u>Do you own a home</u>?
>
> A. <u>No</u>.
>
> Q. No.  I saw the picture of a fancy house.[3]  <u>Do you
> not own that house any longer</u>?
>
> A. <u>No, I do not</u>.
>
> .  .  .  .
>
> Q. So what happened to the house?
>
> A. It was foreclosed upon.
>
> Q. And there's a trustee's deed that's in the deed
> records of Tarrant County?
>
> A. Yes, sir.
>
> Q. Then -- do you still live in that house?
>
> A. Yes, sir.
>
> Q. Have they asked you to leave?
>
> A. No, sir.
>
> Q. But you don't own it?
>
> A. I'm sorry?
>
> Q. <u>You don't own it</u>?
>
> A. <u>No, sir</u>.

---

[3]An aerial photograph of the "fancy house" is in the record of the hearing as Plaintiff's Exhibit 9.
Doc. 117 at 36-37.

Q.   <u>Do you still owe money on that house, according to the lender</u>?

A.   <u>Yes</u>.

Q.   <u>How much, according to the lender, do you owe</u>?

A.   <u>I believe the last number I heard was they were claiming something like 1.9 million, I think</u>.

Doc. 127 at 16-17 (emphasis added).

However, when answering questions by the court, Jones disclosed that there is a lawsuit pending between him and the holder of the mortgage in which he is contending that because of the lender's breach of a settlement agreement and the lapse of time between the debtor's acceleration of the debt and the date of the foreclosure, title did not pass to the lender as a result of the foreclosure, with the consequence that he continues to be the owner of the property. <u>Id.</u> at 18-22. On cross-examination by counsel for SEC he again acknowledged, and added, that his position in the litigation with the lender is that he owns his home free and clear. <u>Id.</u> at 37. Yet, notwithstanding the importance of complete information to an evaluation of Jones's financial capability, Jones offered no evidence in the form of an exhibit or exhibits related to the litigation between him and the mortgage company (other than the notice of intent to foreclose, notice of acceleration, and substitute trustee's deed) or the settlement agreement he

8

mentioned.   Jones's initial intent appears to have been to

leave the impression with the court that he had no financial

interest in his home and that he still owed the lender almost

$2,000,000.

Another unexplained area of puzzlement was why Jones, with

knowledge that a foreclosure was to occur on his home, was

making large investments in 2015 to improve and furnish the

home.  Doc. 127 at 42-43, 46-54.  His attorney professed

ignorance on that subject.  Doc. 133 at 37.

Also, the evidence offered by Jones during the disgorgement

segment of the hearing concerning disposition by Jones of a

$4,250,000 fee award he received in an arbitration proceeding

in June 2015[4] was surprisingly skimpy.  Jones made little

mention of the June 2015 arbitration award during the

examination of Jones by his attorney in the disgorgement

segment.  The only time he mentioned it on direct examination[5]

was when the court asked him questions about his spousal

---

[4]Evidence of the award was put of record by the plaintiff through its Exhibit 14.  The Final Order in Arbitration Proceedings that is the last page of that exhibit discloses that Jones was awarded the sum of $4,250,000, subject to a credit of $250,000 previously advanced to him, in a dispute between Jones and an attorney by the name of Marc R. Stanley related to fees awarded as part of a settlement of a lawsuit known as the Haddock Lawsuit.  Pl.'s Ex. 14 at 2-3.

[5]On redirect examination Jones told of certain payments that were made from the $4,250,000 fee award, Doc. 127 at 63-64, and during the deposition he gave December 17, 2015, which plaintiff put of record as Plaintiff's Exhibit 1, he discussed payments that were made out of the fee award, Pl.'s Ex. 1 at 70-78 (referring to the reduced-size deposition page numbers).

support obligation to his ex-wife, and the present status of
that obligation.  Doc. 127 at 33-35.  In response to questions
by the court, he said he and his ex-wife had reached a post-
divorce settlement that encompassed his spousal support
obligation and other things, Doc. 127 at 33, that the total
amount his ex-wife received in that settlement agreement was
approximately $2,000,000 in June 2015, and that the funds she
received were from fees he earned when a class-action
suit was settled.[6]  Id. at 33-35.

---

[6]When Jones made the disclosure about the post-divorce settlement between him and his ex-wife,
the following exchange occurred between the court and Jones's counsel:

> THE COURT:  Mr. Mosser, it occurs to me that the documentation on that
> would be something pretty relevant to what we're doing, and you've given me a lot of
> documentation on other things.
> Where is the documentation on that?
> MR. MOSSER:  I don't know, Your Honor.
> THE COURT:  You haven't tried to find it?
> MR. MOSSER:  I wasn't involved in that portion of the world, and I have not
> seen the documentation on that settlement.

Doc. 127 at 34 (emphasis added).  When the subject of the post-divorce settlement came up while Jones
was being cross-examined during the disgorgement segment of the hearing, the following exchange
occurred:

> THE COURT:  Why did you only get a million five out of the 4,250,000 award?
> THE WITNESS:  It was a negotiation between my ex-wife, her attorneys, and
> myself and my attorney, and it was a combination of -- under the decree of divorce, I had
> basically traded and she received one -- at the time, of course, we didn't know the case
> was going to settle or how much, but she was to receive one-half of the settlement of that
> case.
> THE COURT:  How much did she receive out of the 4,250,000?
> THE WITNESS:  Approximately 2 million, I believe, and then --
> THE COURT:  And is all of that documented in some kind of papers?
> THE WITNESS:  Yes, sir.
> THE COURT:  Why aren't those papers here today, so we can see them?
> THE WITNESS:  I don't -- I don't know, Your Honor.

Id. at 45 (emphasis added).

Again, less than a full disclosure of Jones's financial affairs was made by Jones during the
disgorgement segment.

3.    The Penalties Segment

After the court announced its disgorgement rulings at the conclusion of the disgorgement segment, the court next took up the matter of penalties, if any, to be ordered against Jones. Doc. 127 at 74-78.  The government called two witnesses in support of its position that Jones should be required to pay penalties in addition to disgorgement, suggesting that the penalty should be an amount at least equal to the amount of Jones's ill-gotten gains, i.e., $1,125,000.  Id. at 77.  SEC's witnesses were Richard Sherwood, an Aquaphex investor, id. at 79-90, and Jones, id. at 103-06.

Because of SEC's reliance during the penalties segment on exhibits that, while a part of the summary judgment record, were not on SEC's exhibit list, Jones, through his attorney, objected on the ground of unfair surprise because, Jones's attorney claimed, if they had known that the exhibits were going to be part of the hearing evidence they would have rearranged certain witnesses and had other witnesses available to testify.  Id. at 95.  In response, the court informed the parties that the hearing would not be concluded on March 14 but would be resumed on March 15 so that Jones and his counsel would have an opportunity to produce any additional witnesses and exhibits they thought appropriate to rebut SEC's evidence

11

on the penalties issue.  Id. at 101-02, 106-07.  SEC concluded

its penalty segment evidence the afternoon of March 14, when

the court recessed, to resume on March 15 so that Jones could

offer any evidence he had on the penalties issue.  Doc. 127 at

106-07.

> 4.   The March 15 Session of the Hearing

When the hearing resumed the morning of March 15, Jones did

not call a witness.  He offered additional exhibits, but did

not call or tender a witness to explain, or answer questions

about, any of the exhibits.[7]  Doc. 133 at 3-8.  Once those

exhibits were offered and received, the court heard argument

from counsel for each side on the penalties issue, following

which the court adjourned.  Id. at 8-43.

C.   The Court's Decision on the Penalty Issue

SEC sought by the bringing of this action to obtain a

ruling imposing civil penalties on Jones for violations of the

Securities Act of 1933 and the Securities Exchange Act of 1934,

as authorized by 15 U.S.C. §§ 77t(d)(1) and 78u(d)(3).  The

imposition of penalties is discretionary by the court.

-------

[7]Some of the exhibits, such as the Agreement Incident to Divorce (Def.'s Ex. 18), the Settlement and Compromise Agreement (Def.'s Ex. 19), and a list of disbursements (Def.'s Ex. 20) appear to be ones that would have had potential relevance during the disgorgement segment of the hearing if they had been produced at that time.  If they had been, Jones could have been questioned about items in those documents, and the documents and his testimony related to them could have been taken into account in the court's findings and conclusions related to disgorgement payment issues.

Sections 77t(d)(2) and 78u(d)(3) define the amounts that can be imposed as penalties, as follows:

(A) **First tier**

The amount of the penalty shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

(B) **Second tier**

Notwithstanding subparagraph (A), the amount of penalty for each such violation shall not exceed the greater of (i) $50,000 for a natural person or $250,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

(C) **Third tier**

Notwithstanding subparagraphs (A) and (B), the amount of penalty for each such violation shall not exceed the greater of (i) $100,000 for a natural person or $500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if--

(I) the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(II) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. §§ 77t(d)(2) and 78u(d)(3).[8]

The court has concluded that the facts of this case make appropriate the award of a penalty against Jones, and that $600,000 is an appropriate penalty in light of the facts and circumstances. By agreeing that the allegations of SEC's complaint are true, and that he committed the statutory and regulatory violations alleged in the complaint, Doc. 113 at 19-20, he has admitted violations of the kind contemplated by §§ 77t(d)(1) and 78u(d)(3). Based on those admissions, as well as the summary judgment evidence and the testimony developed during the penalty segment from one of the investors in Aquaphex, the court finds that Jones's violations involved fraud, deceit, manipulation, and deliberate, or at least reckless, disregard of a regulatory requirement, and that such violations directly resulted in substantial losses, and created a significant risk of substantial losses, to other persons. The court is satisfied from the evidence, and finds, that Jones acted intentionally and with severe recklessness in engaging in the conduct that constituted his regulatory violations as alleged in the complaint, and that his financial gains, for which disgorgement is being ordered, were the result of such

---

[8]The quoted language is taken from 15 U.S.C. § 77t(d)(2). The wording of § 78u(d)(3) is identical to the quoted language but is in a different format.

intentional and severe reckless conduct.  In deciding to impose a penalty, and in determining the amount to impose, the court has considered all of the factors appropriate to be considered on those subjects.  See <u>SEC v. Offill</u>, No. 3:07-CV-1643-D, 2012 WL 1138622 at *3 (N.D. Tex. Apr. 5, 2012).

The court has chosen the number of $600,000, which is approximately one-half of Jones's pecuniary gain as a result of his violations, as being a fair and reasonable penalty under all the facts and circumstances and one that appropriately considers all of the factors the court should consider in determining a proper penalty to impose.

D.  <u>Order</u>

Therefore,

The court ORDERS that SEC have and recover from Jones as disgorgement the amount of $1,125,000 plus prejudgment interest thereon in the amount of $51,534, for a total amount of $1,176,534.

The court further ORDERS that by 4:00 p.m. on April 22, 2016, Jones make payment of such $1,176,534 disgorgement and prejudgment interest amount by delivering to the office of Timothy S. McCole, 801 Cherry Street, Suite 1900, Fort Worth, Texas 76102, a certified or bank cashier's check in that amount made payable to SEC.

The court further ORDERS that SEC have and recover from Jones, for the benefit of the Treasury of the United States, an additional $600,000 as a penalty authorized by 18 U.S.C. §§ 77t(d)(2) and 78u(d)(3).

SIGNED March 21, 2016.

JOHN McBRYDE
United States District Judge